# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| ANTHONY C. MARTIN, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | CAUSE NO. 1:08-CV-00046 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |  |
| Defendant. | ) |  |

## OPINION AND ORDER

Plaintiff Anthony C. Martin, who is proceeding *pro se*, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Martin applied for SSI in November 2004, alleging that he became disabled as of April 14, 2003.[2] (Tr. 50-54, 86.) The Commissioner denied his application initially and upon reconsideration, and Martin requested an administrative hearing. (Tr. 23-29, 34-49.) On September 11, 2007, Administrative Law Judge (ALJ) Terry Miller conducted a hearing at which Martin, who was not represented by counsel, and a vocational expert ("VE") testified. (Tr. 336-

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] Martin previously filed an application for disability in June 2003, which was denied. (Tr. 27, 30-33, 55-57, 59.)

77.)

On November 6, 2007, the ALJ rendered an unfavorable decision to Martin, concluding that he was not disabled despite the limitations caused by his impairments because he could perform a significant number of jobs in the national economy. (Tr. 12-22.)  The Appeals Council later denied Martin's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-8.)

Martin filed a complaint with this Court on February 6, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, Martin alleges that the ALJ exhibited bias and failed to adequately develop the record with respect to his 2006 and 2007 medical records. (Br. of Anthony C. Martin, Pl. ("Opening Br.") 2.)

## II.  FACTUAL BACKGROUND[3]

### *A.  Background*

At the time of the ALJ's decision, Martin was twenty-seven years old, had obtained his GED, and possessed work experience as a warehouse worker. (Tr. 55, 62, 66, 131, 347-48.)  In his disability application, Martin alleged that he became disabled in April 2003 due to injuries from gunshot wounds and post traumatic stress disorder (PTSD). (Tr. 65, 93, 114, 121.)

At the time of the hearing, Martin stated that since he was released from prison in November 2004, he has resided with his aunt, two uncles, and cousin in his aunt's house. (Tr. 346, 348.)  He testified that he has two children but that they do not live with him. (Tr. 347.)  He stated that he used to have a driver's license but that it was indefinitely suspended. (Tr. 347.)  He denied any current alcohol or illegal drug use, stating that he has not used these substances since

---

[3] In the interest of brevity, this opinion recounts only the portions of the 377-page administrative record necessary to the decision.

2

prior to his incarceration. (Tr. 365-66.) Martin's daily activities as represented in his Disability Report include performing his own self care, cooking, doing laundry, reading, hobbies, sports, cleaning, shopping, writing rap music, taking a class at Ivy Tech, and looking for a job. (*See* Tr. 72, 75, 77-79, 85, 101-05, 110, 113.)

Martin further testified at the hearing that he has pain with every movement, primarily in his back and legs, stating that under cold or rainy conditions it becomes "unbearable." (Tr. 354, 360-61.) He elaborated that most days his pain is a "seven" on a ten-point scale. (Tr. 361.) Martin admitted, however, that he was not currently receiving treatment for his medical condition as he was "focus[ing] on this disability" due to his financial constraints. (Tr. 355, 357.) He also testified that he suffers from an "emotional injury" as a result of the stress from his multiple gunshot wounds. (Tr. 359.)

### B. Summary of the Medical Evidence

On April 14, 2003, Martin was admitted to the hospital for multiple gunshot wounds. (Tr. 133-59.) He underwent abdominal surgery and was discharged one week later. (Tr. 133-59.) Upon discharge, Martin was hemodynamically stable and had sciatic nerve pain with some right-sided numbness with mild weakness in the right lower extremity. (Tr. 135.) Martin was seen for eight physical therapy sessions and eventually was discharged due to lack of attendance. (Tr. 160-61.) His physical therapist noted that Martin had a "remarkable" return of function and that he did not appear to have functional limitations which would prevent him from searching for gainful employment. (Tr. 160.)

In August and September 2003, Martin was seen at the Matthew 25 Clinic for medication refills and a sore throat. (Tr. 177-82.)

In September 2003, Neil Shamberg, Ph.D., reviewed Martin's records at the request of vocational rehabilitation. (Tr. 183.) He noted Martin's diagnoses of anti-social personality disorder, PTSD, alcohol dependence, and cannabis dependence, and he assigned him a Global Assessment Functioning (GAF) score of 40.[4] (Tr. 183.)

In October 2003, Barbara Gelder, Ph.D., evaluated Martin at the request of the state agency. (Tr. 185-89.) On evaluation, Martin was oriented, had difficulty responding to proverbs and seeing common similarities and differences, could only repeat four digits forward and two digits backward, and struggled with calculations. (Tr. 187.) He could not perform serial sevens and became angry during the examination, which was terminated due to his level of agitation. (Tr. 188.) Dr. Gelder noted that Martin alternated between being irritable and tearful during the evaluation. (Tr. 188.) She assigned him a current GAF score of 22 and a past GAF of 61, together with the following diagnoses: PTSD; major depression, recurrent; alcohol abuse; possible substance (marijuana) abuse; and rule out attention deficit disorder, by history. (Tr. 189.)

In November 2003, K. Neville, Ph.D., reviewed Martin's record and opined that Martin retained the ability to carry out simple, routine tasks in a competitive setting. (Tr. 190-207.)

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.* A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

In December 2004, Martin was referred to Park Center for substance abuse treatment by vocational rehabilitation and welfare. (Tr. 232-39.) He was diagnosed with pathological gambling, cocaine and alcohol dependence in full remission, and cannabis dependance. (Tr. 236, 238.) His treatment plan included medication, substance abuse and gambling treatment, and psychiatric evaluation. (Tr. 237.) In January 2005, Martin missed two appointments and had no further appointments scheduled. (Tr. 231.)

In January 2005, Dr. Gelder re-evaluated Martin at the request of the state agency. (Tr. 240-44.) Her findings were essentially unchanged from her September 2003 evaluation, except that she diagnosed Martin with PTSD, pain disorder due to physical and psychological factors, and rule out mild mental handicap. (Tr. 243.) She assigned a current GAF score of 43 and a past GAF of 45. (Tr. 244.)

On February 17, 2005, Martin was admitted to the hospital after again suffering multiple gunshot wounds to the left forearm, leg, and abdomen, which required surgical repair of his diaphragm, colon, and stomach. (Tr. 245-56.) He was discharged one week later, was prescribed pain medication, and was restricted from lifting. (Tr. 246.) He later sought emergency room treatment for abdominal pain, which was determined to be an abscess. (Tr. 262-75, 296-97.) Dr. Craig Marks provided follow-up care. (Tr. 276-94.)

In March 2005, Dr. Yaroslav Pogorelov evaluated Martin at the request of the state agency. (Tr. 257-61.) On examination, Martin had normal gait and station; did not use an assistive device; and could walk on toes and heels, tandem walk, and squat halfway down and rise from a squatted position. (Tr. 259.) Martin had a negative straight leg raising test and exhibited normal range of motion except in his lumbar spine and right knee. (Tr. 259, 261.) He

5

had 5/5 and symmetrical muscle strength, except for his right leg and left hand; grossly intact sensation; normal and equal deep tendon reflexes; and normal gross movements. (Tr. 259.) Dr. Pogorelov opined that Martin would not be able to stand or walk two hours in an eight-hour work day. (Tr. 259.)

In March 2005, B. Horton, Psy.D., reviewed Martin's record and opined that he could perform simple, repetitive tasks. (Tr. 312-15.) This assessment was affirmed by F. Kladder, Ph.D., in June 2005. (Tr. 314.)

In April 2005, Martin complained to Dr. Marks of sharp, intermittent right lower quadrant pain; left hand deficits; and left leg and foot numbness. (Tr. 278.) Dr. Marks prescribed physical therapy. (Tr. 277-79.)

In April and June 2005, Dr. T. Crawford and Dr. J. Sands reviewed Martin's record. (Tr. 316-23.) They opined that Martin could perform a range of light work with occasional postural activities; no climbing ladders, ropes or scaffolds; and limitations in fingering/fine manipulation. (Tr. 316-23.)

In September 2005, Dr. Nikola Nenadovich of Orthopaedics Northeast evaluated Martin for back pain and right lower extremity numbness at Dr. Mark's request. (Tr. 329-31.) Martin told Dr. Nenadovich that he had used cocaine recently, which helped his symptoms. (Tr. 329.) On examination, Martin had some edema but no evidence of infection, and had well-maintained range of motion. (Tr. 329.) A neurological examination of the lower extremities revealed intact results. (Tr. 329.) X-rays demonstrated lumbar lordosis and projectile fragments but no evidence of fracture or instability. (Tr. 330.) Dr. Nenadovich recommended physical therapy and anti-inflammatory medication. (Tr. 330.)

In November 2005, Dr. Nenadovich noted that Martin continued to complain of back pain and that he had some mild tenderness on palpation. (Tr. 328.) He had an intact neurological examination, some trace weakness in his right ankle, and a negative straight leg raising test. (Tr. 328.) Dr. Nenadovich recommended medication and a home exercise program and that Martin return to see him in sixty days. (Tr. 328.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

### IV. ANALYSIS

7

*A. The Law*

Under the Act, a plaintiff is entitled to SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Martin is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

*B. The ALJ's Decision*

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

8

On November 6, 2007, the ALJ rendered his opinion. (Tr. 12-22.) He found at step one of the five-step analysis that Martin had not engaged in substantial gainful activity since his application date. (Tr. 15.) At step two, he found that Martin had the following severe impairments: history of multiple gunshot wounds from two separate shootings in April 2003 and in February 2005; and PTSD with history of alcohol, cocaine and cannabis dependence reported to be in general remission with possible continued cocaine and cannabis usage. (Tr. 15 (internal citations omitted).) At step three, he determined that Martin's impairment or combination of impairments was not severe enough to meet a listing. (Tr. 15-17.)

Before proceeding to step four, the ALJ found Martin's subjective complaints "not entirely credible" (Tr. 18) and assigned him the following RFC:

> [T]he claimant has the residual functional capacity to perform light work, as defined in the Social Security Administration regulations and rulings, reduced as follows: lift/carry only 10 pounds with the non-dominant left hand; sit/stand option (where the individual can occasionally change positions during the 8-hour workday, but can remain attentive to the task at hand); only frequent fingering with the non-dominant left hand; only occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling; no exposure to wetness or temperature extremes; and limited to simple, routine, repetitive tasks, consistent with unskilled work, no fast-paced or strict production requirements, only simple work-related decisions, only occasional workplace changes, only occasional and brief interactions with others, and no work with the general public.

(Tr. 17.) Based on this RFC and the VE's testimony, the ALJ determined at step four that Martin was unable to perform his past relevant work as a warehouse worker. (Tr. 20.) The ALJ then concluded at step five that Martin could perform a significant number of other jobs within the national economy, including electrical accessories assembler (500 jobs in the region), wire worker (200 jobs in the region), and small products assembler (500 jobs in the region). (Tr. 21.) Therefore, Martin's claim for SSI was denied. (Tr. 21-22.)

9

## C. Martin Fails to Substantiate His Allegations of ALJ Bias

Martin first contends that the ALJ was biased against him, arguing that the ALJ discriminated against him and made "mockery statements about [his] condition" that caused him to "storm out of the hearing in emotional distress and in tears." (Opening Br. 2-3, 6-8.)

The Seventh Circuit Court of Appeals has emphasized that its "standard in determining whether an ALJ's display of bias or hostility requires setting aside his findings and conclusions and remanding the case for hearing before a new ALJ is an exacting one . . . ." *Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007) (citation omitted). "When reviewing the evidence, we begin with the presumption that the hearing officer is unbiased." *Id.* (citing *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982)). "This presumption can be rebutted by a showing of a conflict of interest or some other specific reason for disqualification." *Schweiker*, 456 U.S. at 195-96.

In that regard, the Seventh Circuit "has rejected allegations that due process is violated when isolated parts of an ALJ's conduct were challenged but the record as a whole demonstrated fundamental fairness in the litigant." *Keith*, 473 F.3d at 788. "It is only after a petitioner has demonstrated that the decisionmaker 'displayed deep-seated and unequivocal antagonism that would render fair judgment impossible' that the presumption is rebutted, the findings set aside, and the matter remanded for a new hearing." *Id.* (citing *Liteky v. United States*, 510 U.S. 540, 556 (1994)).

Here, Martin's claim of ALJ bias falls flat, as he complains of a statement made by the VE, *not* the ALJ. (Reply Br. 4, 6.) Specifically, in response to a string of profanity employed by Martin toward the close of the hearing, the VE stated: "Maybe next time it'll kill him." (Tr. 377.) Admittedly, this comment is inappropriate; however, it does not establish bias on the part of the

10

ALJ, particularly when viewed in the context of the hearing proceedings as a whole. *See Keith*, 473 F.3d at 788. Indeed, the record reflects that the ALJ consistently displayed patience and diligence in re-directing Martin throughout the hearing in order to obtain the necessary information about his claim, despite Martin's frequent offering of extraneous information. (*See, e.g*, Tr. 349, 358-60, 367-68.)

Simply, Martin has produced no evidence that suggests the ALJ was biased against him, and thus his first argument fails to warrant a remand of the Commissioner's final decision.

*D. The ALJ Fully and Fairly Developed the Record*

Martin also asserts that the ALJ failed to fully and fairly develop the record. Specifically, Martin contends that the ALJ's development of the record was deficient because the ALJ failed to obtain certain treatment records from 2006 and 2007. Martin's argument is ultimately unavailing.

    1.  <u>Waiver of Counsel</u>

To ensure a valid waiver of counsel, the ALJ must explain to a *pro se* claimant "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of fees." *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994); *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991). Here, the ALJ fulfilled the first two requirements through various papers sent to Martin by the Social Security Administration prior to the hearing and through statements he made to Martin at the beginning of the hearing. (*See* Tr. 23A, 47-48, 339-41.) As to the third requirement, though the ALJ did inform Martin that court approval of fees is required, he did not explain that the limitation on attorney fees is

11

twenty-five percent of any past due benefits, which renders his waiver of counsel invalid. *See Binion*, 13 F.3d at 245 (concluding that the claimant's waiver was invalid because, though the ALJ provided the rest of the required notice, the ALJ failed to explain the twenty-five percent cap to the claimant).

    2. <u>Development of the Record</u>

If the ALJ does not obtain a valid waiver, the burden shifts to the Commissioner to show that the ALJ adequately developed the record. *Id*. ("Without the shifting of this burden, no sanction would exist for an ALJ's inadequate explanation of a claimant's rights."); *see also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). To adequately develop the record when a claimant is unrepresented, the ALJ must "scrupulously and conscientiously probe into, inquire of and explore for all the relevant facts . . . ." *Skinner*, 478 F.3d at 841-42 (citation omitted*); see also Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997); *Binion*, 13 F.3d at 245.

Once the Commissioner establishes that the record was developed fully and fairly, "the plaintiff has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap." *Binion*, 13 F.3d at 245. "Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant." *Id*. (citation omitted). Nonetheless, courts "generally respect the [ALJ's] reasoned judgment" with respect to how much evidence to gather, *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994), and thus a significant omission is usually required before a court will find that a remand is warranted. *Nelson*, 131 F.3d at 1235. In other words, "the omission must be prejudicial." *Id*.

Here, at the start of the hearing, the ALJ asked Martin if there were any new documents that were not in the record. (Tr. 341.) Martin responded that he was not currently being treated,

12

but that he received care in 2006 and 2007 from Park Center and from a chiropractor at Orthopaedics Northeast and that he had not seen those documents. (Tr. 341-45.) He also stated that he had undergone surgery in 2006 performed by Dr. Marks at Parkview North. (Tr. 352-53.) The ALJ then stated that he would try to get those records. (Tr. 345, 376-77.)

The record reflects that the ALJ attempted to secure these additional records. After the hearing, that is in June 2007, the ALJ sent letters to Park Center, Dr. Marks of Orthopaedics Northeast, and Parkview North Hospital requesting all of Martin's records from 2005 through the present; however, no new records were submitted from these sources. (Tr. 16, 19, 327-35.) In fact, Parkview North stated that a search of its hospital records indicated that Martin had not been a patient between January 2005 and September 2007.[6] (Tr. 19, 333.)

The Seventh Circuit Court of Appeals has indeed commented "on the difficulty of having a complete record as one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on." *Luna*, 22 F.3d at 692 (citation and internal quotation marks omitted). As stated *supra*, courts "generally respect the [Commissioner's] reasoned judgment" as to how much evidence to gather. *Id*.

In that regard, 20 C.F.R. § 416.912(d) provides that before determining that a claimant is not disabled, the Commissioner has the responsibility to develop the claimant's "complete medical history," which is defined as the records of the claimant's medical sources covering "at least the 12 months preceding the month in which [the claimant] file[d] [his] application." *See*

---

[6] Though Martin criticizes the ALJ for requesting his records from Parkview North rather than Parkview Memorial Hospital, Martin testified at the hearing that his 2006 surgery was performed at Parkview North. (*See* Tr. 353.) Thus, the ALJ cannot be faulted for sending his request to Parkview North.

13

*also Luna*, 22 F.3d at 692-93. Here, Martin filed his SSI application in November 2004, and thus the 2006 and 2007 records he disputes do not necessarily pertain to the twelve months preceding his application date. Furthermore, at the hearing the ALJ inquired at length into Martin's subjective complaints and his treatment history, during which Martin stated more than once that he currently was not receiving any treatment for his conditions, attributing this to his financial constraints. (Tr. 342, 355); *see Ryan v. Barnhart*, No. 04 C 0584, 2004 WL 2038848, at *9 (N.D. Ill. Aug. 27, 2004) (finding that the ALJ had adequately developed the record where the claimant identified an additional treating physician at the hearing, and the ALJ inquired in detail about the dates and type of treatment sought from that doctor).

Considering all of the foregoing, the ALJ fully and fairly developed the record concerning Martin's impairments. As explained *supra*, once the Commissioner establishes that the record was adequately developed, the plaintiff has the opportunity to rebut this showing by establishing prejudice or an evidentiary gap. *Binion*, 13 F.3d at 245-46. Here, Martin fails to demonstrate how he was prejudiced by this alleged evidentiary gap in the record; that is, he does not specifically identify any evidence that the ALJ failed to elicit that would make a difference in the outcome of this case. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelson*, 131 F.3d at 1235 (quoting *Binion*, 13 F.3d at 246).

In sum, the ALJ fully and fairly developed the record in this instance, exploring all the relevant facts. *See Binion*, 13 F.3d at 246. Thus, Martin's second argument also fails to warrant a remand of the Commissioner's final decision, and the Commissioner's decision will be

14

affirmed.[7]

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Martin.

SO ORDERED.

Enter for this 26th day of January, 2009.

                                                      S/Roger B. Cosbey
                                                    Roger B. Cosbey,
                                                    United States Magistrate Judge

---

[7] Martin also asserts that the ALJ failed to adequately develop the record because there were no signatures on some of the state agency forms. (Opening Br. 5.) This argument is meritless as the documents Martin refers to are electronic forms containing information that he provided to the state agency. (*See* Opening Br. 2; Tr. 59-71, 86-100, 121-27.)